Our second case this morning is case number 4110808, Pocklington v. Ameren. For the appellant, we have John Rosenstein. And Brian McKinney. McChesney. McChesney. Oh, yeah. My eyes aren't too good. I need glasses. Are you both going to be arguing? No, sir. Okay. And for the appellant, Matthew Champton. Yes, sir. You may proceed. Good morning, Your Honor. May it please this court, Mr. Champton. My name is John Rosenstein. I, along with Brian McChesney, represent the plaintiffs in this matter. We are here for the third time in this case asking you to reverse the trial court. The current state of this is after our last decision from this court, we went back to the trial court and ten days later they filed a motion for summary judgment. And we were given some time to do some depositions and put some additional facts in, which we did. And then the court gave us a very short decision, a short order, granting the motion for summary judgment with no real analysis. We believe that the decision of the trial court should be reversed for three reasons. First, we believe that the law of the case from the last time we were here should apply. Second, we believe that there are factual questions as to comparative fault. And third, if the defendant, Amber and I.P., is correct, then there would really never be a duty to warrant on their part. There would never be a warnings case that would be viable. First, as it relates to the law of the case. When we were here last time, this court reversed in part and affirmed in part. And the part that they reversed and sent back was the warnings issue. The warnings claim of the plaintiff. And in that decision, you at this court said, this is a viable claim. Go back and proceed not inconsistently with what this court had ruled. Because of that, we feel that at that time, that was the law of the case that was established. We believe that that was a viable claim that is for the trier of fact to determine whether or not there was comparative fault on the part of anybody besides Amber and I.P. That brings us to the testimony that was put into evidence at the hearing before the trial court. Which means that there clearly are factual questions that should apply to this case for the trier of fact. The questions that were put in effect clearly favor the plaintiff in this case as creating a question of fact. We'll start with Mr. Plunkett. Gordon Plunkett was a retained expert, but he's also a fact witness in this matter. And Gordon Plunkett worked for the company that sold odorizing materials to Amber and I.P. He also, from time to time, distributed literature to the people that he sold odorants to. And when he gave them the odorants, he gave them this literature and he talked to them about what they should do in their warnings. And in those warnings pamphlets that he gave to them, he said the strong scent or the weak scent of odorant should never be something that the people should rely on when determining what to do with a reaction to the smell of natural gas. If you leave it to the person in the house to smell odorant in a strong or a faint, as it is put in the Amber and I.P. pamphlet, you're asking for trouble. The only thing you should do when you smell gas is get out of the house. That's what he said. And he said that were these people warned properly, they would have gotten out of the house. What's the importance of the tariff? The tariff, in this case, is important because they're relying on it as the sole way that they win. If they say that unless they are the sole proximate cause that we cannot win. And that brings me to my last point, which is there would never be a warnings case. Here's the reason why there's a question of fact that makes the tariff not applicable yet. Because we get to have someone decide whether or not they were the sole proximate cause. A warnings case presupposes that there's going to be a leak. A warnings case comes about as the fact that there is gas in this house or in this structure. What do you do with it then? And that takes me back to the people from Ameren IP that we deposed. And they were the ones that were in charge of the warnings. So that's why it's important with the tariff that we still get to show whether or not they were the sole proximate cause in a warnings case. Because in a warnings case, there's going to be gas in the house. The sole proximate cause of them dying is the fact that they did not leave. Is there language in the tariff that provides this duty? That sorts this duty? The tariff does not provide the duties. But the Adams case talks about duties when it comes to gas leaks. And that's a case that they rely on as well. But the tariff itself does not talk about duties. And there's common law duties. And then there's duties that are set out by RP 1162, which has been adopted by Illinois. And that is the duty to warn the things that they have to do. And to that end, we took Gina Meehan, who's in charge of Ameren IP's program for warning people, and we talked to her about what they do. And we talked to her about the surveys that they gave to see if their warnings were effective. And the statistics show that they probably weren't very effective in getting those warnings out. And Ms. Meehan got very emotional when we said, why did these people not leave? And she said, they probably didn't know what to do. And that's critical when it comes to a warnings case, that they have an obligation under RP 1162 and common law to warn these people on how to react when gas comes. And she's admitting that they probably did not know what to do. And the statistics that were quoted in her deposition show that they weren't making an effective message get through to these people. It just didn't happen. There's evidence of that. And the jury can consider that to determine whether or not the sole proximate cause of them dying in the injuries is because they didn't know what to do. It's a duty under RP 1162 to do effective warnings. And even Ms. Meehan said, there's zero good to a warning if it isn't effectively received by the recipient. And that comes back to Mr. Plunkett talking about the pamphlet that they sent out. In that pamphlet, they basically say to the people of the household, if it's a strong odor, you ought to leave. If it's a faint odor, why don't you go take a look at it and then maybe call us later if it persists. That's asking the people in the house how they're going to interpret it. And there's something called olfactory fade, which if you've been in gas for a period of time, you don't smell the odor anymore. And that's a question that is a question of fact as to how that may have played a role in this as well. We also took the deposition of Jerome Themig, who is in charge of a big chunk of Ameren's programs and in charge of the safety and warnings, along with Ms. Meehan. And with Ms. Meehan and Mr. Themig, we had questions that were directed to them. And we asked them, isn't it a fair question of fact as to whether this was an effective warning? And they both said yes. We said to her, isn't it a fair question of fact as to whether or not these people in this house knew what to do? Yes. We said to her, whose responsibility is it to tell them? And she said, it's Ameren IP's. What did they tell them? That's a great question. And then what they did tell them, was that effective? So yeah, I mean, we don't know that they ever got it. Was there a pastor involved? There's a bill stuffer that was involved. There was an ad in a newspaper about six weeks before this accident. So we don't know that they ever got it. We don't know that it was effectively delivered. Those are things that they can argue as to whether or not it was effectively delivered. But their own statistics from the surveys that they're required to do under RP 1162 really don't give us a great indication as to how many people got these things. Go ahead, Justice. Some of this stuff was sent with the monthly bill, wasn't it? Correct. Some of this stuff was. Some of the people that were injured and killed were not residents of this house either.  I'm sorry, Your Honor. How do we get around the language, damages shall be shown to have been occasioned solely by the negligence of the utility? Well, as I said earlier, in a warnings case, the damages are caused because the people did not leave the house. And it is up to the utility to warn people and to odorize and tell them what to do when they smell natural gas. I'm not sure how you get around that language I just indicated. Solely by the negligence of the utility because certainly the failure to warn is important or not warning appropriately, but how do we even get there if it wasn't the utility's fault that there was a gas leak? Well, if that reasoning is correct, then they really wouldn't have a duty to warn. They just wouldn't because there's going to be gas in the house. What do you do when there's gas in the house? If that is the case, then they don't have to warn anybody and they haven't warned anybody and we have the same set of circumstances, there's no liability. If they sent zero warning to these people and did not do anything to warn anyone, then you know what? If this house blows up, they're off the hook. If that's the correct reading, I don't think that makes sense because they clearly have a duty to warn because our RP-1162 is there. If that tariff supersedes this, then they have no duty to warn really because in a warnings case, it presupposes that there's going to be gas in the house. That's the only way you can have a warnings case. So if we are using that tariff to say that they don't have a duty to warn, I mean that's a very strict reading of it, but I think that it can't make sense that way in terms of their obligations under RP-1162, which has been adopted by the Illinois Congress Commission and wasn't effective this time. And all those are questions of fact for the trier effect in this case as to whether or not it was effective and whether or not they succeeded in their obligation to warn. Well, what did they tell us? Did they tell us several different ways? Leave the house and call us? No, that's not what their warning said at all. That's what Gordon Plunkett, our expert, said the warning should have said. If it was effectively delivered, it should have said that. What theirs says is if you notice the odor of gas, check your pilot lights and that sort of thing. If it's faint, you can do that. If it's strong or if it persists, you should leave. Well, every expert says if you smell natural gas, get out of the house. Clear the area. In fact, their own education system tells you that. No, no, it eventually should be that. What do you mean eventually? No, no, you should leave the house first. But were they told to call a utility? If it persists or doesn't go away or if it's strong. Well, how many people that cook would think that it made much sense to leave the house without checking the burner that they bumped against? How many people that cook that smell gas would not think it was good? Wouldn't they look at the stove first? They might. If they were in the kitchen and they were cooking? They absolutely might. They wouldn't leave. They might not. That's very true. They might not. Well, if they do leave and call a utility company, our rates are going to go up. Not that that ought to be a prime consideration, but I mean there is a... in that the idea of a faint odor or an odor the first time you notice it when you don't have the issue of... you look. You look around. Correct. Particularly if you're in the kitchen. Some people might, but Mr. Thieming said he would rather have them call them. They do not get upset about people calling utilities. They have people on staff that respond to those things. And I don't remember what the number was. He said how many thousands per year that they respond to. But there are people that are hired specifically for that. And that wasn't a concern of his. He'd rather have people call and have them come take a look. And that is different than what they're teaching these students in school. People that Gina Behan talked about, they have a slogan that says, Smell gas, leave fast. Or something. I'm on board with that. And that's different than what they're telling people in their bill stuffers. That's different than what they're telling people in their newspaper ads. So those are all questions as to what were they doing and were they doing it correctly. And so that's kind of... So your view is there might be an expert that would dispute... Whether their warning was good enough? Yeah. We have one. Well, I mean, back and forth. That's why there's an issue on that. Yeah, exactly. There could be. They could have someone that comes in... You might have someone like me that says, well, if it's faint, if you have any brains at all, you ought to look at your gas stove. Right. And maybe beyond that, you say, well, I already know how to find a pyrolight. That's true, too. In a heater. Or in a hot water heater. So I'll leave and call somebody. And one of the things, the facts of this case is we have people that may have had an odor fade that I talked about before because it happened right when they woke up and the gas was clearly leaking throughout the night at some period during the night. And so that's the big picture in terms of why we think there's a question of fact between Mr. Plunkett, who actually sold odorant to Amron IP for decades, and who gave them all the time these inserts that said, don't put a warning out like this, and they did it anyway. And their own statistics that show that the message may not have been delivered or it may not have been delivered effectively. I mean, those are very critical points. And when we get an order from the trial court that has no analysis and we don't know what he was thinking when he granted summary judgment, I mean, he just said, summary judgment granted, case dismissed, cause stricken. That doesn't tell us anything. And I think that that's important, too, is we have all the new information that was sent to the court in the hearing that we had, and a few days later we get that. I mean, it doesn't tell us anything. And, Your Honors, we respect your request because it's the third time we've been here and because of the lack of analysis on the decisions, we respect your request, and in addition to the case being reversed, a new trial judge would be assigned to this. Thank you, Your Honors. Thank you. You'll have rebuttal. Mr. Champlin. Good morning, Your Honors. Good morning. It pleases the Court, Counsel. This accident is undeniably tragic. It was an unfortunate circumstance, and I feel for the family involved. It is not, however, an accident for which Ameren is liable. If we look at the tariff, which this Court has previously done, you will see that the tariff provides for liability only when the cause of the injury was occasioned solely by defendant's negligence. That was the unequivocal holding of this Court on the previous appeal. Now, they argue for application of law of the case. We agree. We ask this Court to apply the law of the case it created on the last appeal. On remand, we submitted evidence that the gas leak was created by somebody who improperly installed this flare fitting. They don't dispute that. The trial court on remand gave them time to conduct discovery. They chose to focus on the warnings and whether or not there was a breach of duty. You don't even get to the breach of duty issue if Ameren's liability is barred by this tariff. They, in fact... What should we do about the adequacy of the warnings? I mean, as a society. Because it is clear here that there's a dispute, either in the industry or among experts, about maybe the protocol or what the warning ought to say. Correct, Your Honor. And, you know, I don't think that is the issue before the Court. I understand that, but I asked you a question. Sure. I believe that RP 1162 provides guidance and provides, through the regulatory agency, the Illinois Commerce Commission and the Department of Transportation, they have the authority to enforce those regulations, and they, in fact, do enforce those regulations. If they thought Ameren's program was inadequate, they have the power to take corrective action against Ameren. It does not create a cause of action that supersedes this tariff. This tariff, as the Court appropriately recognized in its last holding, is the law of the case. They sued the party that installed, or the party they believe installed, this flare fitting. And that's important to know, because this Court's previous interpretation of the tariff does not mean that they are without a remedy. It means that they are without a remedy against Ameren. They still had a remedy, and for whatever reason, they chose not to pursue a cause of action against the people who actually caused the leak, that caused the explosion. Now, we'll get back to Justice Connect's kind of public policy argument. It seems that you're saying we have a house here that blows up. Three people are killed. The fourth one is severely injured. Ameren could be 99% responsible, but they're not solely responsible, and therefore there's no remedy that plaintiffs can seek against Ameren at all? I think that this Court's previous holding is clear in that regard. I think the tariff language is clear in that regard. And the purpose of a liability-limiting tariff recognizes that utilities are highly regulated monopolies that have to keep their rates low. And a rule-limiting liability accomplishes this goal. Now, they talk a lot about, well, this interpretation would get rid of warnings claims altogether. Because the cause of the leak, or the cause of the explosion, is going to be the gas leaking into the house. And in this case, the person who improperly installed the flare fitting. Well, I think that's precisely the purpose of the tariff, is to get rid of nebulous claims. If there were ever a category of claims to get rid of, I think warnings claims would fall in that category. For the same reason that Justice Knapp mentioned, he can get an expert, I can get an expert, and they could always file a failure to warn claim against the utility company, even though this utility company's warnings had nothing to do with it. And the underlying cause, the actual cause of the explosion, was customer equipment inside the house, which Ameren had no control over. I think opposing counsel is arguing that under these facts, Ameren could have provided absolutely no warning of any kind whatsoever, and they still would have no liability, because whoever put in the flare fitting is responsible, not Ameren. That's what I believe he's arguing, and that seems to be a pretty logical argument to me. Am I stating it correctly? I agree with you, Your Honor. Doesn't that seem odd, though, that they could completely fail to warn, completely, and it doesn't make any difference? Well, first of all, they didn't completely fail to warn in this particular case. I understand that. But that is the terms of the tariff. The tariff applies. I mean, we as a society, we legislate and we contract out of our common law duties all the time. You look at governmental immunity, we don't always get a result that under the common law we would arrive at. But that goes to the legislature, that goes to the commission, and in this case, the legislature and the commission sought fit to limit liability in this manner, and specifically in regard to the warnings, for this very reason. The fact that they are nebulous claims, and you can always find an expert to say, you know, you provide them with a phone book. Well, there were too many warnings. You provide them with a sheet of paper. There weren't enough warnings. It wasn't bold enough. We didn't read it. The content was incorrect. We did read it, but we relied on this content that was incorrect. There are so many different possibilities here. I think that is precisely the purpose of this tariff, and on remand, we showed as a matter of law, which is completely undisputed by them. They had plenty of time. If they thought this wasn't a cause of the explosion, to provide evidence of such, which they didn't, we showed as a matter of law that Amarin is not the sole cause. And I see no reason for this court to not apply the law of the case doctrine. There are two exceptions to the law of the case doctrine. One is that if this court finds this previous opinion palpably erroneous, which obviously I don't think is the case here, for the same reasons we raised in our brief on the last appeal, and this appeal as well. Two, no higher court has addressed the issue in this case and come to a contrary conclusion. And that's worth noting because the Supreme Court had an opportunity to do so. They saw a petition for leave to appeal on the last appeal. It was denied. So there is no basis to throw out the law of the case. And the law of the case, to me, is clear. As the court, in its opinion, wrote, we hold this is when the tariff applies to our liabilities. For those reasons, I would ask that this court affirm the summary judgment entered by the trial court, and the fact that the trial court did not specify the basis for his opinion. I think the basis for his opinion is clear. There was only one argument we made on remand, and that is we were not sole proximate cause. Not only that, a trial judge does not have to itemize the reasons he's granting summary judgment. That's well-established law. And there's absolutely nothing here, nothing in this case, to indicate any personal bias that would subject it to being assigned to a new judge on remand should this court choose to remand the case again. Okay, thank you, counsel. Thank you, Your Honor. Rebuttal, please. Thank you, Your Honor. It's interesting. He all but said it. He just said it. Let's get rid of warnings cases. And isn't it interesting how this has come about? The Adams tariff, that went to the Supreme Court, and they said there was still some liability there. So they made the tariff a lot stronger. I find it interesting that we may now know the reason why. Let's just get rid of warnings cases. He said it. We also know that there is a statistical probability, based on Ms. Meehan's testimony, that the warnings never got to these plaintiffs. And finally, he was talking about all the immunities that we give up contractually, all the common law things that we give up contractually, all that we give up government immunities. We do this. It's all contractual that we give up these causes of action. Well, Mikey, the 9-year-old who was killed in this case, he didn't give up anything contractually. He was not. He couldn't give it up contractually. Your Honor, we suspect the request of this Court refers to Trump. Thank you very much. Thanks to both of you. The case is submitted. The Court stands in recess.